IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MICHAEL STERN, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 12−cv−785−SCW |
| | ) |
| ST. ANTHONY'S HEALTH CENTER, | ) |
| | ) |
|         Defendant. | ) |

## ORDER

**WILLIAMS, Magistrate Judge:**

This matter comes before the Court on Defendant St. Anthony's Health Center's Motion for Summary Judgment. (Doc. 34). Defendant asks the Court to grant its summary judgment motion on Plaintiff Michael Stern's claims of age and disability discrimination. (Doc. 34). Plaintiff brought claims under Age Discrimination in Employment Act (ADEA) and the Americans with Disabilities Act (ADA). (Doc. 2). Plaintiff filed a Response brief on September 23, 2013. (Doc. 42). Defendant filed a Reply on September 30, 2013, making this Motion ripe for disposition. (Doc. 44). For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

### FACTUAL BACKGROUND

Defendant operates an acute care facility in Alton, Illinois, which provides inpatient and outpatient services. Defendant hired Plaintiff on or about March 23, 1998 to serve as a Clinical Psychologist in its Psychological Services Department. (Pl.'s Dep. p. 56, 70). In February 2002, when Plaintiff was approximately 62, Defendant promoted Plaintiff to Chief Psychologist. (Doc. 2). Plaintiff served in that capacity until his termination. Although Plaintiff had previously weathered an accusation of sexual harassment, he otherwise had a productive relationship with Defendant and received a positive performance evaluation in March of 2010. (Pl.'s Dep. pp. 39-40; 137-38)

1

Plaintiff had supervisory, administrative, and clinical responsibilities as part of his role as Chief Psychologist. (Pl.'s Dep. p. 82-86) (Doc. 35-1, p. 36). Plaintiff oversaw a department staffed with five licensed counselors and another psychologist. (Fischer Dep. p. 23-24) (Pl.'s Dep. p. 82). Plaintiff estimated that supervising other employees in his department took approximately 30 to 50 percent of his time. (Pl.'s Dep. p. 83). He estimated that he spent approximately 15 to 30 percent of his time on administrative tasks, like billing, budgeting, pre-authorization issues, quality control, and promotion of the department. (Pl.'s Dep. p. 84-85, 175). Plaintiff spent the remaining 15 to 25 percent of his time providing care to patients. (Pl.'s Dep. p. 84). On a good week, this might amount to 16 patients. (Pl.'s Dep. p. 173-74). Sixty percent of Plaintiff's patients were children, and Plaintiff considered 75 percent of those children to be complex cases, meaning that they had chronic problems and multiple diagnoses. (Pl.'s Dep. p. 174). Approximately 50 percent of Plaintiff's adult cases were complex cases. (Pl.'s Dep. p. 175). Patricia Fischer, Vice President of Physician Services, testified that these functions would be essential functions of Plaintiff's job as Chief Psychologist. (Fischer Dep. p. 42-44) (Doc. 35-1, p. 36).

In July 2010, a member of the Psychology Service Department resigned and requested an exit interview. (Doc. 35-3, p. 4). Tracy Sashidharan, a licensed therapist under Plaintiff's supervision, told Ann Rieser at a meeting on July 9, 2010 that she had concerns about Plaintiff's memory and cognitive functions. (Doc. 35-3, p. 5). Specifically, she observed that Plaintiff was frequently late to work and for appointments; that he would forget appointments completely; that he would take 6 to 12 months to complete testing reports for school districts when the reports should have been completed in 2 weeks; that he failed to chart basic information when treating patients; that he failed to get preapproval from insurance companies when treating patients, resulting in a loss of revenue for the department; that he illegally photocopied copyright-protected testing forms for department use; that he administered employee evaluations improperly; and that he made sexually

suggestive and unwelcome comments to his coworkers. (Doc. 35-3). Sashidharan also indicated that she had spoken to Plaintiff about her concerns several times, but that Plaintiff had been dismissive. (Doc. 35-3, p. 4). Sashidharan's concerns and frustration about Plaintiff's continuing ability to run his department factored into her decision to resign from St. Anthony's, although she also wished to start her own private practice. (Doc. 35-3)(Doc. 42-7).

Rieser escalated Sashidharan's concerns to Fischer, who as Plaintiff's direct supervisor commenced an investigation. (Fischer Dep. p. 28). Fischer interviewed Sashidharan, who reiterated her concerns. (Fischer Dep. p. 29) (Doc. 35-3, p. 5). Fischer then interviewed other employees in Plaintiff's department and received other information that concerned her. For example, she spoke to Shannon Baugher, Clinical Psychologist, who reported that patients had complained about lack of follow-up. (Fischer Dep. p. 58). Fischer also spoke to Susanne Ringhausen, the Director of the Employee Assistance Program, who reported that she had observed Plaintiff exhibiting irritability and forgetfulness, and that she believed Plaintiff made other women in his department uncomfortable. (Fischer Dep. p. 75). Fischer also relied on her own observations. Specifically, she was concerned because Plaintiff had forgotten several discussions they had about filling a position, and because she believed Plaintiff had mishandled the treating of her relative. (Fischer Dep. pp. 24-27; 17-21).

Fischer escalated her concerns to Dr. Burch, the Vice President of Medical Affairs. Burch agreed that the concerns raised were in need of further evaluation from an outside source. (Burch Dep. p. 10). They scheduled a meeting with Plaintiff to inform him of their concerns and request that he submit to an evaluation. (Burch Dep. p. 11). Defendant placed Plaintiff on administrative leave until he could schedule the evaluation. (Pl.'s Dep. p. 153). While Fischer initially turned to the Illinois Health Professional's Program for a list of recommendations, she agreed that the hospital would pay for a fitness for duty evaluation by a doctor of Plaintiff's choice. (Pl's Dep. pp. 153-159).

Plaintiff selected Dr. Fucetola, Ph.D., Chief of Clinical Neuropsychology at Washington University Medical School. (Pl.'s Dep. pp. 158-59).

Dr. Fucetola's report indicates that he examined Plaintiff on August 29 & 30 of 2010. (Doc. 35-7, p. 13). He found that Plaintiff's physical exam showed some memory retrieval difficulties on mental status testing. (Doc. 35-7, p. 19). A neuropsychological evaluation showed mild to moderate deficiencies in short term memory, word retrieval, and working memory. (Doc. 35-7, p. 19). His memory index scores showed mild to moderate impairment, correcting for age and education. (Doc. 35-7, p. 19). Plaintiff also had trouble with tests that measured semantic fluency and responsive naming, particularly when the test was adjusted for his high IQ. (Doc. 35-7, p. 19). Fucetola evaluated Plaintiff on a formal dementia scale as well and found only mild difficulties in orientation. (Doc. 35-7, p. 19). Plaintiff showed significant sematic intrusion when asked to learn a verbal task. (Doc. 35-7, p. 19). Plaintiff behaved appropriately during the exam and was friendly. (Doc. 35-7, p. 19). Throughout the testing period, he demonstrated word-finding difficulties and trouble understanding complex instructions. (Doc. 35-7, p. 19). Overall, Fucetola found "mild cognitive impairment amnesic form picture, with difficulties in short term memory and word retrieval." (Doc. 35-7, p. 19).

Fucetola recommended that Plaintiff follow-up with his primary physician and consider getting another evaluation in twelve months to assess the progress of his condition. (Doc. 35-7, p. 19). He found that Plaintiff was "not fit for duty in his current position as a hospital director of psychology." (Doc. 35-7, p. 19). Fucetola specifically found that the combination of administrative and clinical duties was too much for Plaintiff to handle with his current memory impairment. (Doc. 35-7, p. 19). The report concluded that it may be "possible" for Plaintiff to continue with his clinical duties by using strategies, like note taking, to compensate for his memory loss. (Doc. 35-7, p. 19). However, Fucetola testified during his deposition that the problems identified by testing

could not be completely resolved by note taking because he believed that "the breath and severity or magnitude of the short-term memory problems was significant." (Fucetola Dep. pp. 33-34). The report also suggested "structuring a lighter caseload, perhaps working less than full time, seeing fewer patients per week, and/or seeing less complex cases (e.g. non suicidal patients) . . reduce workload." (Doc. 35-7, p. 19). Fucetola also recommended a one year interim plan with monitoring by a supervisor. (Doc. 35-7, p. 19). Fucetola testified that these suggestions would be an attempt to minimize the impact of Plaintiff's short term memory loss on his daily functioning. (Fucetola Dep. pp. 43-44). The question of whether or not Plaintiff could serve as a psychologist would depend on Plaintiff's duties. (Fucetola Dep. p. 44). Fucetola testified that he would be concerned that Plaintiff would have problems interviewing a patient and then remembering that conversation later in the day or in the next session because Plaintiff demonstrated clear problems with recalling new information after a thirty minute interval. (Fucetola Dep. p. 60).

Fucetola gave his report to Fischer, who then convened a meeting with Sr. Anselma Belongea, the Vice President of Professional Services, and Burch on September 8, 2010. (Burch Dep. p. 16). Fischer recalls discussing several areas of concern. First, Fucetola's report recommended giving Plaintiff less complex cases, but St. Anthony's did not divide their patients in that manner, and they would have to rely on Plaintiff's evaluation as a psychologist to determine whether a case was complex or not. (Fischer Dep. pp. 62-63). They also discussed the risk that any patient deemed "less complex" may progress to complex over the course of treatment. (Fischer Dep. p. 63). Additionally, they were concerned that the report indicated the Plaintiff's recall was compromised after thirty minutes, when the typical psychology session lasted sixty minutes, a set-up which may have limited Plaintiff's ability to rely on notes. (Fischer Dep. p. 63); (Burch Dep. pp. 26-27). Finally, the administrators discussed liability, and came to the conclusion that the report's reservations about Plaintiff's memory would make it difficult for them to defend themselves should

they have a patient commit suicide. (Fischer Dep. p. 63). Additionally, reducing Plaintiff's caseload would place him in a part-time position. St. Anthony's did not have a part-time position in their Psychology Department. (Fischer Dep. p. 61). They ultimately concluded that Plaintiff was not fit for duty in any capacity. (Burch Dep. p. 16).

On September 15, 2010, Fischer and Belongea met with Plaintiff to review Fucetola's findings. (Pl.'s Dep. p. 204)(Belongea Dep pp. 17-20). Although there is some disagreement on this point, it appears that the participants came to an agreement that Plaintiff, at the very least, would have to give up his clinical and supervisory duties. (Pl.'s Dep. p. 205) (Fischer Dep. p. 64) (Belongea Dep. pp. 19-20). But Fischer and Belongea told him there was not an open position for a clinical psychologist in the program at the time. (Pl.'s Dep. p. 206) (Belongea Dep. p. 20). Plaintiff's last day of work was on September 17, 2010. (Pl.'s Dep. p. 212). The department was later restructured to eliminate Plaintiff's position, and his caseload was absorbed by other employees. (Fischer Dep. pp. 23, 69). Plaintiff is currently self-employed and has not held any other positions as a department head.

**LEGAL STANDARDS**

1. **Summary Judgment Standard**

Summary Judgment is proper only "if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." ***Dynegy Mktg. & Trade v. Multiut Corp.,* 648 F.3d 506, 517 (7th Cir. 2011) (internal quotation marks omitted),** *citing* **FED. R. CIV. P. 56(a)**. On summary judgment, the Court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. ***Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010).** The party making the motion has the burden of establishing that he is entitled to judgment as a matter of law and no factual disputes remain. ***Wollin v. Gondert,* 192 F.3d 616, 621-22 (7th Cir. 1999)**.

### 2. ADA Claims

To establish a prima facie case of discrimination on the basis of a disability under the ADA, a plaintiff must establish 1) he is disabled within the meaning of the ADA, 2) he is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and 3) he suffered from an adverse employment action because of his disability. **Hoppe v. Lewis University, 692 F.3d 833, 838-39 (7th Cir. 2012) (citing Nese v. Julian Nordic Const. Co., 405 F.3d 638, 641 (7th Cir. 2005)**. If the plaintiff can establish a prima facie case, the burden shifts to the defendant under the analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), so that the employer may offer a legitimate non-discriminatory reason for its decision. **Nese, 405 F.2d at 641**. The burden then reverts to the plaintiff to show that the stated reason was pre-textual. **Id.** When faced with a motion for summary judgment, a plaintiff must submit evidence to the court that would be sufficient for a jury to find in his favor on each element of the claim. **Kotwica v. Rose Packing Co., Inc., 637 F.3d 744, 748 (7th Cir. 2011)**.

To determine whether a job function is essential, federal regulations permit courts to consider the following categories of evidence: "1) the employer's judgment as to which functions are essential; 2) written job descriptions prepared before advertising or interviewing applicants for the job; 3) the amount of time spent on the job performing the function; 4) the consequences of not requiring the incumbent to perform the function . . .5) the current work experience of incumbents in similar jobs." **29 C.F.R. § 1630.2(n)**. The employer determines the essential functions and qualifications for the position at issue. **Feldman v. Olin Corp., 692 F.3d 748, 755 (7th Cir. 2012); Lloyd v. Swifty Transp. Inc., 552 F.3d 594, 601 (7th Cir. 2009); Webster v. Methodist Occupational Health Centers, Inc., 141 F.3d 1236, 1238 (7th Cir. 1998)**.

In Response to a Motion for summary Judgment, Plaintiff must submit sufficient evidence for a jury to find in his favor on all four elements of the prima facie case. The parties' dispute on

this issue turns on whether Plaintiff was qualified to perform the essential functions of his job, with or without accommodation. At the time of his termination, Plaintiff was not qualified to perform the essential functions of Chief Psychologist. Plaintiff and Defendant agree that the essential functions of Plaintiff's job included supervisory, administrative, and clinical duties. The fitness for duty evaluation specifically found that Plaintiff could not perform the essential functions of the Chief Psychologist position because he was not capable of doing the supervisory and administrative tasks associated with the position. The report also stated that Plaintiff *might* be able to continue doing some clinical duties, provided he received a decreased case load and non-complex cases. There is also testimony in the record from other employees in Plaintiff's department that they had observed him having difficulties with supervisory and administrative tasks.

Although Plaintiff attempts to discredit the fitness for duty report by suggesting that it had been improperly revised, Plaintiff's claims on this point are speculation. Fischer testified that she asked Fucetola to revise the report to provide a clear yes or no answer on whether Plaintiff was fit for duty. (Fischer Dep. p. 87). Fucetola had no memory of making any changes, other than his assertion that he "doesn't do drafts." Even construing the facts in Plaintiff's favor, the Court can only conclude that the revisions to the report were minor and included, at most, the addition of the fitness for duty section. There is no evidence that the results of the medical testing performed by Fucetola were changed at Defendant's request, and in fact Fischer testified that during the same conversation in which she asked Fucetola to provide the fitness for duty language, they discussed Plaintiff's "issues with learning and memory . . . [and] cognitive issues in terms of word retrieval and memory," implying that Fucetola had already made his conclusions on those points. (Fischer Dep. p. 88). This is entirely consistent with the report in the record. There is no evidence that Fischer told Fucetola to provide a specific answer, or attempted to influence his decision. In fact, Fischer

8

testified that she had no opinion on whether Plaintiff was fit for duty before seeing the report. (Fischer Dep. p. 84).

Fischer also testified that at the meeting with hospital administrators, Plaintiff agreed that he should give up the non-clinical tasks. Plaintiff claims that this creates a material issue of fact because he has always believed that he could do the job. (Pl's Dep. p. 205). However, Plaintiff did not testify that he told the hospital administrators he could do the job; he testified that he did not agree to give up those duties and that they "misunderstood[] . . . my intention" and that "they must have heard that I was . . . consider[ing] making changes." (Pl's Dep. p. 205). He also testified that he agreed that he could serve solely as a clinical psychologist. Plaintiff's testimony establishes that he may not have intended to voluntarily give up the administrative duties, but it is consistent with the Defendants' testimony that he verbally agreed to give up those tasks. It is not sufficient to create a material issue of fact. Even if the Court were to accept that his comments effectively communicated a belief in his abilities, the testimony is still just Plaintiff's subjective opinion, and insufficient to defeat a motion for summary judgment. **See Miller v. Dept. of Corrections of the State of Illinois, 916 F.Supp. 863, 870 (C.D. Ill. 1996)**. Plaintiff has not submitted expert testimony contradicting Fucetola's report or shown that he has held comparable positions since his termination. His testimony that he subjectively believed he could fulfill his obligations at the time of his termination does not meet his evidentiary burden on summary judgment.

Plaintiff also attempts to discredit the Tracy Sashidharan affidavit submitted by Defendant by submitting a different Sashidharan affidavit. The Court finds that the two affidavits are not inconsistent. The second affidavit merely lists additional reasons for her departure and testifies about Sashidharan's impressions of Plaintiff's character. It is not relevant to the issue of whether Plaintiff is qualified to perform the essential functions of his position. Plaintiff also points to Carol Snook's deposition to rebut Defendant's contention that other employees had concerns about

9

Plaintiff. However, Snook, as a secretary, is not qualified to evaluate Plaintiff's performance on clinical, administrative, or supervisory tasks, and does not constitute the complete list of employees with concerns, as identified by Fischer. Therefore, her testimony is insufficient to create a material issue of fact as to whether other employees in the department had concerns about Plaintiff's job performance.

Plaintiff also alleges that his final evaluation in March of 2010 shows that he could perform the essential functions of his job. Evidence of past favorable performance reviews is not relevant because the applicable inquiry is whether the Plaintiff was capable of performing at the time of his termination, not five months prior. **Hongs v. Children's Memorial Hosp. 993 F.2d 1257, 1262 (7th Cir. 1993)**. Plaintiff also points to Fischer's selection of him as a treatment provider for her niece, in May 2010. This is immaterial for the same reasons, although the Court also notes that Plaintiff's position completely ignores Fischer's testimony that Plaintiff's treatment of her relative raised concerns in Fischer's mind about Plaintiff's abilities.

Finally, Plaintiff points to his discharge paperwork, which reflects that he left his position voluntarily. Defendant does not contend that Plaintiff left his position voluntarily, and there is testimony that Fischer allowed the form to be completed in this matter to spare Plaintiff embarrassment. The termination form itself provides no evidence on whether Plaintiff was qualified to perform the essential functions of his job.

Having determined that Plaintiff is not able to perform the job of Chief Psychologist without accommodation, the Court turns to the question of whether Plaintiff was qualified to perform his job with accommodation. Plaintiff argues that Defendant was obligated to have an "ADA accommodation discussion," and that failure to do so is a per se violation of the ADA. However, the cases cited by Plaintiff indicate that a plaintiff must request the accommodation before liability under the ADA attaches. **Cloe v. City of Indianapolis, 712 F.3d 1171, 1176 (7th**

10

**Cir. 2013).** Here, Plaintiff at no time requested any type of accommodation, and argues in the very same Response to Motion for Summary Judgment that when the administrators heard him say he would give up some of his essential functions, they misunderstood him. Plaintiff cannot have it both ways. The evidence is clear that Plaintiff did not bring any of the difficulties he was experiencing to his supervisors. He has also contested the fitness for duty report up until this stage in the pleadings. There is no evidence that he wanted or requested an accommodation. **See Cloe, 712 F.3d at 1178 ("[T]he employee's initial duty requires that he or she 'indicate to the employer that she has a disability and desires an accommodation.'")(quoting E.E.O.C. v. Sears, Roebuck, & Co., 417 F.3d 789, 803 (7th Cir. 2005))**. Defendant had no obligation to engage in an interactive accommodation process, and the fact that they did not is not dispositive on a motion for summary judgment when the plaintiff has not made a showing on the prima facie case.

But this is beside the point. It is also clear from the evidence in the record that Plaintiff would not be qualified for a job as a clinical psychologist, even if his disability were accommodated by removing his supervisory and administrative functions and reducing his caseload as suggested by the Fucetola report. First, Fucetola's report does not conclusively state that Plaintiff could adequately perform his clinical duties. Specifically, it states that "it is possible that currently [Plaintiff] would be more likely to be able to complete routine clinical duties, including psychotherapy, by relying upon common strategies to compensate for memory difficulty." (Doc. 35-7, p. 19). The Seventh Circuit has previously determined that a statement from a medical professional stating that "there was a good chance" that an employee could return to work with treatment is too conclusory and uninformative for the court to find that an accommodation would have been successful. **Weigel v. Target Stores, 122 F.3d 461, 468-69 (7th Cir. 1997)**. The statement here is similar, and does not permit the Court to conclude on the basis of Fucetola's report that Plaintiff could have been able perform the essential functions of a psychologist.

11

Additionally, Defendant evaluated Fucetola's other proposed recommendations and found that Plaintiff would still not be qualified for a position of psychologist. For example, Fucetola suggested increased supervision, but Fischer testified that she would not be competent to supervise Plaintiff's clinical duties because she was not a psychologist. Additionally, as a matter of law, an employee who requires significant supervision as a result of a medical condition where previously they acted autonomously will not be qualified for their position. **Webster v. Methodist Occupational Health Centers, Inc., 141 F.3d 1236 (7th Cir. 1998)**.

Defendant also submitted testimony that a clinical psychologist position at St. Anthony's required full time work and required that a psychologist be able to handle complex cases. As the employer, Defendant may set the essential functions of the job. There is ample evidence in the record to support the claims that these requirements were essential functions. There is testimony that Defendant did not divide its patients into complex/non-complex cases, and that it would be difficult to do so because Defendant would have to rely on Plaintiff as the treating psychologist to make those determinations. The hospital was also concerned about the possibility that cases identified as non-complex could become complex over time. There is also testimony that Defendant did not have any part-time employees in the psychology department and that there were no open positions there at that time.

Additionally, although note-taking has also been floated as a solution, Fucetola's report is similarly vague as to whether that strategy would be a successful accommodation. The report indicated that Plaintiff experienced short term memory loss after thirty minutes, whereas most counseling sessions lasted an hour. Fucetola himself expressed reservations that Plaintiff could perform adequately with the accommodation of note-taking because it would be difficult for him to retain information from the beginning of the session without immediately writing it down.

Therefore, the Court finds that Plaintiff would not have been qualified for his position with or without an accommodation and that he has failed to make out a prima facie case of discrimination. Because Plaintiff cannot establish that he was qualified for his position with or without accommodation, the Court need not address the arguments related to reasonable accommodation or pretext.

### 3. ADEA Claims

Plaintiff also brought a claim pursuant to the ADEA. For liability to attach, the act requires that age be the "but-for" cause of an adverse employment decision, like the termination here. **Gross v. FBL Fin. Serv., Inc., 557 U.S. 167, 180 (2009); Fleishman v. Con'l Cas. Co., 698 F.3d 598, 604 (7th Cir. 2012)**. Plaintiff relies on the indirect method of proof, which again, uses the *McDonnell* burden shifting analysis. Plaintiff would need to show that: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate expectations; 3) he suffered an adverse employment action; 4) he was treated less favorably than similarly situated individuals who are not members of his protected class. **Faas v. Sears, Roebuck, & Co., 532 F.3d 633, 641 (7th Cir. 2008)**. The burden then shifts to the employer to offer a legitimate nondiscriminatory reason, which the employee may then rebut by showing that the reason is pretext. **Mills v. First Fed. Sav. & Loan Ass'n of Belvidere, 83 F.3d 833, 842-43 (7th Cir. 1996)**.

Plaintiff cannot make out a prima facie case of age discrimination. Plaintiff cannot show that he was meeting his employer's legitimate expectations in light of the fitness for duty report finding that he was unable to perform key functions of his job, and reports from his subordinates detailing his difficulties. Additionally, Plaintiff has not pointed to any younger employees who were treated differently than him. Even if Plaintiff could make out a prima facie case, Plaintiff could not show that his employers stated reason for terminating him— cognitive difficulties— was pretextual because the existence of that disorder has ample support in the record, and Plaintiff has never

argued that he does not suffer from some difficulties with his short term memory. Plaintiff has further stated since the filing of his Response to this Motion that he "gives up and withdraws all claims made pursuant to the ADEA —the age discrimination claim." (Doc. 66, p. 3). Therefore, Defendant is entitled to judgment in its favor on this point as well.

## CONCLUSION

Plaintiff has failed to submit enough evidence that he was qualified to do his job, with or without reasonable accommodation. Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment. The Clerk of the Court is directed to enter judgment in Defendant's favor and close the case.

**IT IS SO ORDERED**

**Date:** 11/08/2013   /s/ *Stephen C. Williams*
Stephen C. Williams
United States Magistrate Judge